With that, we'll proceed to the last case on our oral argument calendar this morning, which is Sheridan v. Caesars Enterprise. May it please the Court, this is Daniel Marks with Julie Sheridan. I'd like to reserve five minutes for rebuttal. Julie Sheridan was a corporate executive who had a fixed-duration employment contract, a written employment contract. That contract provided specific grounds of just cause determination and necessitated specific reasons to terminate her. Nevada has long followed the common law of contracts, including the restatement, and the Nevada Supreme Court has never utilized a handbook standard as it was utilized by the district court judge in this case. Obviously, it's a de novo review here because we contend the district court utilized the wrong standard. Quoting from the Vargas case, which was relied on by the district court, on the first essential page, the Nevada Supreme Court, and this goes back to, I think, 1995, said, the primary issues on appeal address questions concerning whether there was an implied contract of continuing employment, and if so, whether Southwest breached the contract in terminating Vargas. And if later in the opinion, the Nevada Supreme Court says, there are obvious policy concerns implicated in treating an employment contract implied from an employee manual in the same manner as a negotiated contract. I don't know if you're familiar with the line of handbook cases. There's Coltrane in California, and I believe Simpson up in Oregon. Nevada has never said written fixed duration employment contracts get less protection than other contracts. This is a fixed duration contract. Vargas was a handbook. My client had a fixed duration contract. For reasons that are unclear, this judge, there was no oral argument, just took the handbook standard, quoted, just out of context, handbook provisions, and said no reasonable jury could find for my client. Now, in the actual contract itself, that belies the decision by the district court. Because in the contract, it was a three-year written contract. After the three years, it says the employee would become at will. So the parties understood that after three years, you'd be at will, and obviously at will, you could be fired for any reason or no reason. Subsection 9, which listed the grounds for termination, on one of the grounds, A, performance, it reserves sole discretion to Caesars Palace. All the other provisions said the exercise of reasonable discretion. In a fixed duration contract, whether one party breaches or not, whether they acted reasonable or not, I'd say in the long history of Nevada common law and common law in the United States, that's a issue for the jury. It's a factual issue. There were numerous, numerous facts in dispute. For whatever reason, unexplained, the district court weighed the evidence. The district court took all inferences in favor of the defense. And the defense, in their briefing, doubles down on suggesting that you should adopt a rule that fixed duration for-cause employment contracts are somehow second-class contracts and don't deserve the full protection of the law. There is absolutely no support for that proposition in Nevada, or it's just totally not supportable. Additionally- So is it your position that Vargas doesn't apply to fixed duration contracts? Exactly, and that's what it says. But in the Vargas decision itself, it references the employment contract. Correct, and that would be dictum. It's never been utilized to overturn. There's no lessening of common law in restatement law in Nevada. And the court itself says there are policy concerns in deciding how much protection a handbook should get because there's no mutuality in a handbook case. And that's also the rule in California and most other states. Remember, prior to handbooks, the first handbook case in Nevada came in the 1980s. There'd be no way someone would argue on a written employment contract that you don't have the normal, traditional standard of the defendant having to prove just cause in a fixed-duration employment contract. Handbooks came in starting in the 1980s in the case Ahmad v. Southwest Gas. In the 90s, a plaintiff who was terminated, Mr. Vargas, went to a jury trial and essentially argued the handbook was akin to a fixed-duration contract. He received a verdict of $300,000. The Supreme Court said we have issues with that. We don't want to discourage the use of handbooks. They put in the opinion the employer could abandon handbooks and call everybody out well. However, they said we're going to reach a balance. And the fact they say the word express, that's never been adopted in Nevada to say your for-cause written employment contract based on a handbook case somehow wiped out hundreds of years of common law, wiped out the restatement standard on for-cause contracts. That's just totally, totally not the law in Nevada. Additionally here, my client is fired for something she did not do. This was a team-building project. Remember, these are people who are selling Las Vegas hospitality to the rest of the country. So if someone wanted a bar convention or someone wanted some, you know, Google or somebody wanted a meeting in Las Vegas, my client was involved in one team of West Coast marketers. They were actually remote before the pandemic. They came to Las Vegas. They did team-building. The events in question were after hours where they tasted, for want of a better word, the hospitality of Las Vegas, including restaurants, shows, bars, et cetera. It was voluntary after hours. The night in question, my client went to bed at 10.30. The woman who ultimately got ill was brought up to her room by my client at 10.30. Later, after my client was terminated, the bartenders found they didn't find the group overly intoxicated. Yet they fired my client. They never gave her a reason at the time because this woman, Katie, left her room, I guess went back down to the bar and either ate or drank or somehow got ill. We never found out because no one subpoenaed her medical records. Obviously, their HIPAA protected. But the point was she was at work at 8.30 the next day. So whatever happened, presumably it could have been a combination of August heat in Las Vegas. It could have been she ate something. It could have been she drank something. No one knows. But to blame my client and say that's somehow misconduct or a violation of that written contract is just clear error. My client's not a middle school field trip teacher. She can't lock people in their rooms with yellow tape. My client acted responsibly going to bed at 10.30, which is before nightlife even begins. The fact someone got sick and passed out in August in Las Vegas is certainly not unheard of. But they terminated her without a complete investigation. They terminated her without referring or reading the contract. They never referred to the exact portion of the contract. And then when we brought this suit, the district court relied on a handbook case and ignored the actual terms of the fixed duration contract, which provided Cesar's had to exercise reasonable discretion. The only part of the contract that said sole discretion was performance, and Cesar specifically told Julie and testified at deposition they were not terminating her for performance. Her performance was fine. So you have a situation that's virtually unheard of. If someone has a contract for cause and someone is going to be terminated, I suggest anywhere in America, they're told this is the provision and this is what you did and given an opportunity to rebut it. Here, Cesar's, for reasons that are totally unclear, terminated her without any reason. During discovery, we found there was no clear alcohol policy at Cesar's. There was no clear comp policy at Cesar's. Even though Cesar's has tremendous experience regarding alcohol, and Cesar's essentially is involved in selling and partying with alcohol, they never wrote a specific policy limiting alcohol. And again, this was an after-hours, voluntary drinks, dinner, and shows that arguably wouldn't be covered anyway. They were Cesar's employees, but this was all after team building was over. The idea that a manager can have total control over what other people do after hours, late at night, belies there'd be no need for contracts. If Cesar's could just do what they want and ignore the contract and ignore the reasons, there'd be no common law rules of contract. Unless the court has specific questions, I'd like to reserve the balance of the time. Very well. We'll hear from Cesar's. Good morning, Your Honors. May it please the court, Diana Lerma on behalf of Cesar's Enterprise Services, LLC, defendant and appellee on this case. The district court, in ruling on the motion for summary judgment, applied the correct standard here, which is the Nevada Supreme Court case, Southwest Gas versus Vargas. There, the employer brought a motion for summary judgment. However, plaintiff was able to prove that a disputed material fact existed. And that is the reason that that case went to the jury. Right. And in Vargas, the ruling specifically states that it applies to an implied or an express agreement. Even if the agreement is expressed, the standard is the same. A discharge has to be for good cause. If it's not arbitrary, capricious or illegal. And it's based on facts supported by substantial evidence and reasonably believed by the employer to be true. That is what we have with regard to the reason for Ms. Sheridan's termination. In addition, the most important part, I think, about Vargas is that the issue went to the jury. The jury did find that Vargas was entitled to relief. Nonetheless, on a motion notwithstanding the verdict, the court said the jury got it wrong. If the court found that the jury got it wrong, there is no reason why the district court cannot find that Caesars got it right in this instance. It is a matter. It is an issue that can be decided as a matter of law. Here we have the benefit of having Ms. Sheridan's conduct actually on video surveillance. There is no room for an arbitrary, capricious or illegal basis for her termination. We submitted manual filings of the video surveillance taken the night of the alleged events. And I would ask that your honors look at Exhibits 11. That's where Ms. Sheridan is actually seen on video taking pictures with a whiskey bottle from the bar. Exhibit 12, where Ms. Sheridan is actually seen flipping her middle finger to employees that report to her. Exhibit 14, where Ms. Sheridan is seen passing shots of whiskey to her employees. Exhibit 16, where for two minutes and a little more than two minutes, Ms. Sheridan is seen pouring shots for her employees out of the same bottle that she had just put onto her tongue. And also Exhibit 19, which shows her handing out shots to all of her team. The conduct that Ms. Sheridan was fired for did occur after hours. Ms. Sheridan was hired to be a leader of 14 people. She was hired as the Director of Strategic Account Management to lead 13 people. And while Ms. Sheridan's job duties did include a technical aspect to sell events at Caesars, her job was also to manage and lead her team. She was fired and terminated for cause because she failed to do that. What she did the evening of August 7, 2019, is she went downstairs, encouraged and fueled excessive drinking with her team. There were almost 80 drinks ordered. Almost over $1,000 of drinks were charged to the Caesars corporate account by Ms. Sheridan and the other people that reported to her. She was the most senior level employee at the event. She organized the event. She was the one that allowed the shots. She was the one that pulled the bottle of whiskey from the bartender. She asked the bartenders to take shots. She passed shots to her team. Yes, she did go to bed at 10.30. A leader went to bed at 10.30 after fueling such excessive drinking. And then the next morning, she reprimanded her team because they didn't stick to the buddy system. Ms. Sheridan absolutely failed to take any responsibility for her involvement in the occurrences of late August 7th into the mornings of August 8th. Ms. Sheridan fueled this and facilitated the conduct that led to one of her employees actually being hospitalized because she was found in her hotel room naked in a pool of her vomit. And she was taken by emergency services to the hospital. Mr. Marks is correct. Ms. Sheridan is not responsible to ensure that an employee does or does not drink. But Ms. Sheridan encouraged these people to drink. The testimony, the evidence shows that she actually ridiculed people who did not want to drink. And even in her deposition testimony, Ms. Sheridan herself admits that her conduct on the evening of August 7th, 2019, was not professional. That is what we're talking about at the end of the day. The rules of the road were incorporated into the employee agreement that Ms. Sheridan signed. Now, I think this is very important. Ms. Sheridan read the agreement, understood the agreement, and herself testified that she even reviewed the agreement with an attorney. There is no doubt that her employment agreement was clear and there was mutual assent between the two parties as to what would constitute a termination for cause. She understood that she had to manage her expenses, that she could not have a dishonest issue that caused harm to the company. She knew that alcohol could not interfere with the performance of her duties. And she also knew that the rules of the road, created by Caesars in the employee handbook, controlled her employment. The rules of the road are very clear. The rules of the road state that, and I'm quoting, Occasionally, alcohol is served at social events sponsored by the company. Only the moderate and limited use of alcohol is acceptable. Team members are expected to remain responsible, professional, and sober at all times. Ms. Sheridan is unable to present a disputed material fact because she herself admitted that her conduct wasn't professional. In her deposition, at the excerpt of record, page 112, she was asked if pouring eight shots of whiskey from the same bottle that she had put her tongue on was professional, and she responded that it probably was not. Ms. Sheridan cannot escape the fact that what she did that evening was create a situation that put her team in danger, and that following the incident, she was not forthcoming with all of the details in the investigation. Caesars completed a thorough investigation that took approximately 20 hours to complete. The testimony is by Catalina Doves on that subject. She interviewed at least five people before recommending, in conjunction with Mario Heidke, to Mr. Massari that Ms. Sheridan had violated the explicit terms of her employment contract. Ms. Doves testified that she reviewed the employment contract, that she compared the contract with what the findings were based on the actual video surveillance that was saved. Based on the recommendation from Human Resources, Mr. Massari agreed that Ms. Sheridan had violated her employment contract by failing to be an appropriate leader for Caesars. Nowadays, where an employer can be held liable for so much of what happens, including off-duty conduct, Ms. Sheridan was an exempt managerial director-level employee. Any allegation by counsel that what happens while outside of the meeting is not attributable to Caesars is simply incorrect and a misstatement of the law. She represented Caesars. She was the highest-ranking official at that meeting. Following the thorough investigation Ms. Sheridan was met with, she was suspended pending investigation. There was a due process interview where Caesars specifically explained to Ms. Sheridan the concerns that they had with regard to her conduct. The excessive drinking, encouraging drinking, the shots, how she was managing her team. All of that is identified in the SPI notes that are also included in our supplemental excerpt of records on pages 11 through 18. Mario Heidke specifically states that he was concerned with how she acted and how she could lead the team moving forward. As of that date, Ms. Sheridan knew what she was being investigated for. Ms. Sheridan had the opportunity to respond. The following day, Ms. Sheridan was terminated for cause. Now, it's important to note that in the employment contract itself, Caesars doesn't have to do an investigation, but Caesars still did an investigation. Also, what the district court found in their order is that the contract and the employee handbook states that yes, there is some conduct that will result in progressive discipline, but there is also some conduct that will result in immediate discipline. This is a case where the conduct is so egregious that there is no way that a jury could possibly find that Ms. Sheridan did not breach the agreement. In addition, there is absolutely no evidence showing that Caesars did not follow through with a reasonable investigation. It used reasonable discretion, and based on its reasonable belief, it let go of Ms. Sheridan. On behalf of Caesars, unless there are any other questions, I conclude and ask that the court affirm the district court's order. Thank you, counsel. Mr. Rebuttal? Yes, may it please the court. We know the district court got the wrong legal standard, and I'll tell you why. When you look at Vargas, Vargas cites SIMSA, that's a handbook case. Yotsoff, out of Oregon, that's a handbook case. Ahmaud, Southwest Gas, that's a handbook case. Ponza, that's a handbook case. Rulon Miller, that's a handbook case. Beales-Hillhaven, that's a handbook case. Farmer, American Bank Stationery, that's a handbook case. And then they cite a case, Tucson Blue Cross. Back in the 90s, there was a legitimate dispute between the Blue Cross line of cases, which wanted to give more protection to handbooks, and what was adopted, the Vargas, which also was adopted in California as Coltrane, which gave less but some protection to handbooks. We know from reading Vargas, other than that one statement was taken out of context, that the Vargas analysis was a public policy decision of what protection to give handbooks. There's nothing in Nevada that suggests written fort cause fixed duration contracts would be lessened. Now, counsel's arguing drinking. There are contracts where someone gets a DUI. There are contracts where someone's in an accident and a DUI. It doesn't mean automatic termination. You look at what's the cause and what's the contract. That's why you have negotiated contracts. There's not a blanket rule, alcohol, bad, termination, especially in Nevada. Caesars never, in their depositions, they admitted they didn't look at the contract. They never were looking for cause. It's possible it appeared from the depositions they thought she was at will, where they thought they had sole discretion. They never went down the issues. Now, what is good cause is not a one-way street. It has to be defined in the four corners of the document. There was disputed facts of how much drinking. Buying drinks doesn't mean you drank drinks. There was definite disputed information. They fired her before they talked to the bartenders, who didn't think the group was overtly intoxicated, because a lot of people bought drinks and didn't drink them. Ms. Sheridan did take responsibility. She was on the phone that night. I think she was woken up in the middle of the night. She did what she could to ensure the safety of Katie. The next morning, she found Katie was safe. Katie was claiming some third party may have, you know, drugged her or something, and she talked to the team about trying to avoid all of that. So she did take responsibility. There is nothing more, really, she could have done regarding that incident in the middle of the night. Now, regarding the amount of alcohol, Cesar's policy didn't necessarily even apply after hours, when people are on their own time. And they had no specific limit of number of drinks. It was all very vague. There is numerous conflicting testimony, and most importantly, the standard in the contract says reasonable. In our law of contracts, under the restatement, what is reasonable is usually reserved as a question of fact. If the judge, the district court judge, used the wrong legal standard, if he used an arbitrary and capricious standard, rather than a forecaused dexteration standard, the case has to be reversed, because regardless of the facts, if you use the wrong law, it's clear error. Now, we also dispute how much of an investigation was done prior to the termination. The investigation here was nowhere near as complete, extensive, or time-consuming as in the Vargas case. And in fact, here, as opposed to Vargas, Ms. Sheridan was fired before the investigation was even completed. And additionally, Vargas had an extra component of a Title VII sexual harassment overlay, which partially led the court to the decision it made in Vargas, and there's absolutely nothing to that effect here. In fact, Caesars, at the deposition, admitted this termination was not for performance reasons. So based on that, if there are any questions, I'm happy to answer them. Otherwise, we would ask the court to reverse and remand for a trial and write that the court should utilize the correct legal standard. Thank you. Thank you, counsel. Thank you both for your arguments today. The case just argued will be submitted for decision, and we will be in recess for the morning. All rise.
judges: THOMAS, GOULD, BEA